777 A.2d 927

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. ANTHONY KORECKY, DEFENDANT.

LUCKY 7 BAIL BONDS, RESPONDENT.

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. ANTHONY KORECKY, DEFENDANT.

RANGER INSURANCE COMPANY, RESPONDENT.

Argued March 12, 2001—Decided August 6, 2001.

*Marc E. Roessler*, Assistant Prosecutor, argued the cause for appellant (*E. David Millard*, Ocean County Prosecutor, attorney).

*Richard P. Blender*, argued the cause for respondent Lucky 7 Bail Bonds.

*Stephen E. Siegrist*, argued the cause for respondent Ranger Insurance Company (*Murphy & O'Connor*, attorneys; *Mr. Siegrist* and *Edward R. Murphy*, on the brief).

The opinion of the Court was delivered by

ZAZZALI, J.

The issue in this case of first impression is whether the Appellate Division properly set aside a forfeiture of a bail bond because it was "not required in the interest of justice." *R.* 3:26–6(b). The trial court, finding that defendant Anthony Korecky violated a "no contact" condition imposed by the court as part of his release, revoked Korecky's bail and ordered partial forfeiture of the bail bond in the amount of $50,000. Respondents, corporate surety Ranger Insurance Company and its agent, Lucky 7 Bail Bonds, appealed the forfeiture and the Appellate Division reversed. *State*

*v. Korecky,* 333 *N.J.Super.* 78, 85, 754 *A.*2d 601 (2000). The State appealed and we granted certification. 165 *N.J.* 606, 762 *A.*2d 220 (2000). We now reverse the Appellate Division and reinstate the trial court's order of forfeiture, but reduce the amount forfeited from $50,000 to $25,000.

I

In January 1999, Korecky and ten co-defendants were indicted by an Ocean County grand jury on twenty-three separate counts. The indictment charged Korecky with the second-degree crime of being a leader of organized crime, thirteen counts of burglary, one count of attempted burglary, six counts of theft, one count of tampering with public records, and one count of uttering a forged document. Following the indictment, he was arrested and then released after posting a $50,000 surety bond.

In April 1999, five of Korecky's co-defendants appeared to enter their pleas. Although Korecky was not scheduled for a court appearance on that day, he was observed in the hallway outside the courtroom by the assistant prosecutor. The assistant prosecutor reported to the trial court that he observed Korecky approach various co-defendants and attempt to intimidate them. That same day co-defendant Daniel Knoeller testified that Korecky had contacted him one week earlier and threatened his physical well-being if Knoeller decided to testify for the State. The trial court revoked Korecky's bail and issued a warrant for his arrest.

Two days later Korecky surrendered to the authorities. The following day, April 22, 1999, Korecky appeared before the trial court for a bail hearing. The court increased his bail to $100,000 and "ordered that any surety agreeing to post the bond on his behalf, also agree to additional specific conditions that would be added to the bond and be made a part thereof." The trial court imposed a condition on defendant that ordered him "to have no contact of any nature whatsoever, directly or indirectly through others, with any co-defendant in this case who has pled guilty and agreed to testify for the State." At that hearing, Lucky 7 Bail

Bonds (Lucky 7) appeared before the court and submitted a recognizance bond in the amount of $100,000. The recognizance included a power of attorney by underwriter Ranger Insurance Company authorizing an agent or attorney-in-fact of the bonding company to post the bond with the court. The power of attorney, which was stapled to the recognizance bond, stated in relevant part:

Authority of such attorney-in-fact is limited to appearance bonds and cannot be construed to guarantee defendant's future lawful conduct, adherence to travel limitations, fines, restitution, payments or penalties, or any other condition imposed by a court, not specifically related to court appearance.

Ranger Insurance Company contends that neither the Prosecutor's Office nor the trial court "at any time ever contacted Ranger Insurance Company to determine whether Ranger would agree to underwrite the bail bond to include the terms of the [c]ourt's 'no contact' amendment." Only Lucky 7 appeared before the court and was represented by its agent, bail bondsman Mario Pinto. The following exchange took place between Pinto and the court:

THE COURT: Have you received a copy of the additional condition that's part of the bail?

MR. PINTO: Yes, sir.

THE COURT: Do you understand it's going to be attached to your bail bond and surety obligation here?

MR. PINTO: Yes, sir.

THE COURT: Do you understand, then, that you're not only guaranteeing his presence for future court matters with regard to this, but also guaranteeing that or agreeing that if Anthony Korecky has any contact of any nature whatsoever directly or indirectly through others with any co-defendant in the case who has pled guilty and agreed to testify for the State, that his bail will be revoked and your bail bond will be forfeited? Do you understand that clearly?

MR. PINTO: Yes.

THE COURT: So if there's any contact whatsoever, the hundred thousand dollars you're posting is going to be forfeited?

MR. PINTO: Right.

THE COURT: And your company agrees to that?

MR. PINTO: Yes, sir.

The court asked Pinto to sign a copy of the conditions before handing it back to the court. Then the court inquired a second time if Pinto was representing to the court that he was authorized

to bind "the company" with regard to the bond and the attached "no contact" condition: "And you're representing to the [c]ourt that you're authorized to bind the company with regard to this?" Pinto responded affirmatively and after he signed the page containing the no-contact condition, the court had it stapled it to the bond and authorized it to be filed. The "no contact" condition attached to the bond states:

> The bail on Anthony Korecky is hereby set at $100,000, surety bond only. The surety bond is to include the following conditions:
>
> *The defendant, Anthony Korecky, is to have no contact of any nature whatsoever, directly or indirectly through others, with any co-defendant in this case who has pled guilty and agreed to testify for the State.* In the event of any such contact, this bail will be revoked and forfeited. This condition does not preclude counsel for the defendant or licensed investigators for counsel from any such contact in preparation for trial.
>
> Any surety bond for this defendant is to be submitted for Court approval prior to the defendant's release.
>
> [Emphasis added.]

In May 1999, a co-defendant, Kirk Feinstein, entered into a plea agreement in which he agreed to testify against defendant. The Ocean County Prosecutor's Office told Feinstein that Korecky would be arrested if he contacted Feinstein. If any contact took place, Feinstein was instructed to contact the Lacey Township Police Department. Several days later, Feinstein encountered Korecky at the Six Flags Great Adventure Theme Park. According to Feinstein, Korecky noticed Feinstein standing near a rest room with one of his friends. Korecky approached Feinstein and told Feinstein that he looked different. Korecky then said, "Hey, Kirk, you rat. Why are you testifying against me?" Feinstein responded that he was only going to tell the truth about what took place and that Korecky should not be speaking with him. Feinstein characterized Korecky as "upset" and "mad." Feinstein felt threatened by Korecky who stood with his arms down and fists clenched. Feinstein testified that Korecky

> came up closer to me. He put his arms down, and he was saying, you know, he was going to get in a fight with me. And I thought, you know, we were going to have a confrontation right then and there.

And then what he wound up saying is: "You know what? I'll wait till I go to jail, and I'll get you. I won't get you on the street." He said, "I don't care what my bail is." He said, "I'll get out and I'll get you."

Korecky then walked away. Feinstein contacted the police by phone. The police located Feinstein, interviewed him, and then arrested Korecky.

The next day the State filed a motion to forfeit the $100,000 surety bond because of Korecky's violation of the "no contact" condition.

A bail forfeiture hearing took place shortly thereafter. During the hearing, the court stated: "I want you to know that I reviewed a recognizance form without this power-of-attorney attached, and with the additional page attached at the time." Korecky appeared on that day and entered guilty pleas to the charge of being a leader of organized crime, to a number of burglary counts, and to the charge of witness tampering based on his contact with the other witness against him, Daniel Knoeller. In exchange, the State agreed to dismiss the criminal complaint against Korecky for attempting to intimidate Feinstein. On entry of those pleas, Korecky's bail was revoked and he was remanded to jail pending sentencing. The court concluded that Korecky violated the conditions imposed by the court "as part of his release on surety bond and that he exposed the surety to forfeiture of its bond."

At the continuation of the bail forfeiture hearing the court forfeited $50,000 of the bail bond, the amount that the court considered to be the "additional $50,000 [that] was added to that bail when a State's witness [Knoeller] informed the [trial court] during plea proceedings that he had been subjected to threats by the defendant." The trial court subsequently issued an order instructing Lucky 7 and Ranger Insurance Company to forfeit $50,000, payable to the State of New Jersey Bail Fund.

Ranger Insurance Company then moved for reconsideration of the forfeiture of $50,000. At the hearing on that motion, counsel for Ranger Insurance contended that Lucky 7 acted beyond the scope of its power to bind Ranger Insurance because the bail

bondsman, Pinto, was not authorized to amend the bond to allow the imposition of any condition not specifically related to court appearance. The court concluded that sometime after the bail hearing on April 22, Pinto "added another piece of paper (the power of attorney) that indicated that Ranger Insurance was going to be the final party responsible for payment in the matter." According to the court, the power of attorney was not attached to the bond when it was submitted to the court for its review. Both the recognizance bond and the power of attorney were dated April 22, 1999, the date of the first bail hearing at which Lucky 7 appeared. The court decided that "[a] condition of bail imposed prior to the posting of a[b]ond imposes on the surety the obligation to inform himself thereof, and his failure to do so will not relieve him from responsibility under the bail obligation." The court held that Ranger was responsible for the condition, denied the motion for reconsideration, and stated that if Lucky 7 exceeded its authority as Ranger's agent, the matter could be resolved between the surety and its agent. Lucky 7 and Ranger filed separate appeals with the Appellate Division. *State v. Korecky, supra,* 333 *N.J.Super.* at 80, 754 *A.*2d 601. After the Appellate Division reversed the lower court's disposition, the State sought certification of the matter to this Court.

II

The New Jersey Constitution provides that "[a]ll persons shall, before conviction, be bailable by sufficient sureties, except for capital offenses when the proof is evident or presumption great." *N.J. Const.* art. I, ¶ 11. *Rule* 3:26–1(a) sets forth the standard for fixing bail, and then provides that "[t]he court may also impose terms or conditions appropriate to the defendant's release including conditions . . . necessary to protect persons in the community." *Rule* 3:26–6 authorizes a court to order forfeiture of a defendant's bail:

Upon breach of a condition of a recognizance, the court on its own motion shall order forfeiture of the bail. . . . The court may direct that a forfeiture be set aside

if its enforcement is not required in the interest of justice upon such conditions as it imposes.

The imposition of a bail condition is a matter of judicial discretion. *State v. Johnson*, 61 *N.J.* 351, 364, 294 *A.*2d 245 (1972). "Of course, the discretion must be exercised reasonably, having in mind that the primary purpose of bail in this State is to insure presence of the accused at trial, and that the constitutional right to bail should not be unduly burdened." *Ibid.* Any subsequent forfeiture is also a matter of discretion. *State v. Peace*, 63 *N.J.* 127, 129, 305 *A.*2d 410 (1973). As noted, however, forfeiture may be set aside when "enforcement [of the condition] is not required in the interest of justice." *R.* 3:26–6(b). The party seeking to set aside a forfeiture bears the burden of proving that " 'it would be inequitable to insist upon forfeiture and that forfeiture is not required in the public interest.' " *State v. Mercado*, 329 *N.J.Super.* 265, 269–70, 747 *A.*2d 785 (App.Div.2000) (quoting *State v. Childs*, 208 *N.J.Super.* 61, 64, 504 *A.*2d 1212 (App.Div.), *certif. denied*, 104 *N.J.* 430, 517 *A.*2d 423 (1986)). We review the exercise of discretion in the totality of the circumstances presented. *State v. Poon*, 244 *N.J.Super.* 86, 97, 581 *A.*2d 883 (App.Div.1990).

A threshold question is whether bail may be forfeited for breach of a condition other than nonappearance. In *State v. Stout*, 11 *N.J.Law* 124, 133–37 (1829), the former Supreme Court held that a surety was liable on the bond for the breach of a condition requiring that the defendant obtain permission from the court before leaving the State. Although not technically a non-appearance provision, the condition in *Stout* was still geared towards ensuring the defendant's presence at trial. *Stout* thus does not dispose of the question whether forfeiture is permissible for breach of a provision other than one requiring appearance at trial.

Federal cases, which provide guidance, generally conclude that bail may be forfeited in the event of a violation of a condition other than nonappearance. *See United States v. Gigante*, 85 *F.*3d 83, 85 (2d Cir.1996) ("[A] bail bond and its collateral may be forfeited not

only for the defendant's failure to appear, but also for other violations of bond conditions, including the defendant's commission of a crime."); *United States v. Terrell,* 983 *F.*2d 653, 654 (5th Cir.1993) (holding that forfeiture was appropriate when defendant violated court condition of "travel restriction and his promise not to possess marijuana and drug paraphernalia"); *United States v. Santiago,* 826 *F.*2d 499, 506 (7th Cir.1987) (holding that forfeiture was appropriate because defendant "willfully breached the condition of his release by again engaging in drug trafficking while out on bail on a similar offense [and] the government incurred significant costs and suffered inconvenience and prejudice as a result of [defendant's] conduct and [the surety] offers no real explanation or substantial mitigating factors").

In addition to federal authority, the majority rule in other jurisdictions is that bail may be forfeited for a violation of a condition other than nonappearance. *See, e.g., State v. Williams,* 730 *A.*2d 677, 680 (Me.1999) (affirming forfeiture of bail after finding defendant possessed alcohol in violation of condition of release); *State v. Hernandez,* 1 *Neb.App.* 830, 511 *N.W.*2d 535, 538–39 (1993) (holding bond properly forfeited because defendant breached "crime-free" condition); *State v. McLaughlin,* 122 *Ohio App.*3d 418, 701 *N.E.*2d 1048, 1051 (1997) (holding partial forfeiture of appearance bond proper when defendant violated bond condition that he have "no contact" with victim); *Bridges v. Superior Court,* 121 *R.I.* 101, 396 *A.*2d 97, 101 (1978) ("[B]ail system is designed to ensure the accused's presence at court and to keep the accused as much under the control of the court as if he were actually in the custody of a court officer."); *State v. Badzmierowski,* 171 *Wis.*2d 260, 490 *N.W.*2d 784, 786 (App.1992) (holding bond properly forfeited when defendant violated bond no-contact condition).

Conversely, a few jurisdictions conclude that forfeiture would not be appropriate when a defendant breaches a condition of bail other than nonappearance. *See In re E.H.,* 78 *Ill.App.*3d 854, 34 *Ill.Dec.* 115, 397 *N.E.*2d 571, 573 (1979) (holding that bond forfei-

ture statute "does not authorize a forfeiture ... of bond for the violation of any bond condition other than a defendant's failure to make a timely appearance in a designated court"); *State v. Cardinal*, 147 *Vt.* 461, 520 *A.*2d 984, 987 (1986) (holding that "punitive forfeiture of cash bail, originally imposed as a means of assuring defendant's appearance at court, is not the appropriate method of enforcing other conditions of release").

■ We conclude that the majority rule is the better rule. The driving force behind a surety's provision of a bond is the profit motive. As the Appellate Division recently stated, "[t]he private interest affected by the forfeiture judgments is one engaged in for economic advantage; one that involved a known business risk. The surety obligated itself to guarantee the presence of a defendant at a criminal proceeding for economic gain—the premium paid for the bond." *State v. Polanco*, 332 *N.J.Super.* 436, 443, 753 *A.*2d 1170 (App.Div.2000). The same motivation, as well as the same essential obligations, *i.e.*, supervising the client and preventing breach of the condition, are present in both nonappearance conditions and other types of conditions. We find no reason, and the parties have pointed us to none, to distinguish between forfeiture of a surety bond for breach of an appearance condition and breach of a no-contact provision.

■ We pause to note, however, that the primary purpose of bail is clear, based on *Rule* 3:26–1 and other precedents: to secure a defendant's presence at trial. *Stack v. Boyle*, 342 *U.S.* 1, 5, 72 *S.Ct.* 1, 4, 96 *L.Ed.* 3, 7 (1951) ("Since the function of bail is limited, the fixing of bail for any individual defendant must be based upon standards relevant to the purpose of assuring the presence of that defendant."); *ABA Standards for Criminal Justice, Pretrial Release Standard*, 10–5–3(b) (2d ed. 1988) ("The sole purpose of monetary conditions is to assure the defendant's appearance."); Nancy M. King, *Forfeiture of Bail for Breach of Conditions of Release Other Than That of Appearance*, 68 *A.L.R.*4th 1082, 1084–85 (1989) ("[T]he primary reason for requiring a deposit of some security in order for a defendant to remain

free pending the disposition of his case is to assure his appearance in court."). Bail is neither primarily intended as a punishment nor as a guarantee against a defendant's future criminal or other anti-social conduct. *ABA Standards, supra,* 10–5–3(b) ("Monetary conditions should not be set to punish or frighten the defendant, to placate public opinion, or to prevent anticipated criminal conduct."). Those authorities indicate that although our rule allows for the imposition of conditions other than appearance, appearance conditions remain the primary emphasis of the bail system.

█ The next question is whether the trial court properly forfeited $50,000 of the bond here. We first note that a court will assess various factors when determining whether a forfeiture of bail should be allowed. *State v. Hyers,* 122 *N.J.Super.* 177, 180, 299 *A.*2d 748 (App.Div.1973). In cases involving a condition other than appearance, courts should consider: (1) whether the applicant is a commercial bondsman, *Hyers, supra,* 122 *N.J.Super.* at 180, 299 *A.*2d 748; (2) the extent of the bondsman's supervision of the defendant, *ibid.;* (3) whether the defendant's breach of the recognizance of bail conditions was willful, *In re Procaccianti,* 475 *A.*2d 211, 213 (R.I.1984); (4) any explanation or mitigating factors presented by the defendant, *Hernandez, supra,* 511 *N.W.*2d at 539; (5) the deterrence value of forfeiture, *United States v. Gambino,* 17 *F.*3d 572, 575 (2nd Cir.1994); (6) the seriousness of the condition violated, *Peace, supra,* 63 *N.J.* at 129, 305 *A.*2d 410; (7) whether forfeiture will vindicate the "injury to public interest" suffered as a result of the breach, *ibid.;* (8) the appropriateness of the amount of the recognizance of bail, *United States v. Amwest Surety Insurance Company,* 54 *F.*3d 601, 604 (9th Cir.1995); and (9) the cost, inconvenience, prejudice or potential prejudice suffered by the State as a result of the breach, *United States v. Frias–Ramirez,* 670 *F.*2d 849, 852 (9th Cir.), *cert. denied,* 459 *U.S.* 842, 103 *S.Ct.* 94, 74 *L.Ed.*2d 86 (1982). That list is not exhaustive, and trial courts may consider other factors as "interests of justice" require. *R.* 3:26–6.

Both Ranger and Lucky 7 are commercial bondsmen. Implicit in their status, and relevant to this appeal, is a recognition of the rights and risks that attend that occupation. As the trial court observed, a surety "is in the business of risk venture ... engaged in an entrepreneurial venture, the object of which is profit." The court added that "the return it seeks for assumption of risk is substantial, and its fees [are] commensurate with the risk," and that occasional losses therefore must be expected. Both Ranger and Lucky 7 were experienced, licensed professionals. Lucky 7 knew, and Ranger should have known, that there was a no-contact agreement. As professionals, they were aware both of the risk when they furnished the bond and of the consequences of a breach if the bond's conditions were breached. Based on the issuance of the bond, we reasonably may infer that Ranger either had confidence that Korecky would abide by the condition or that it had some guarantees to assure it that the risk was worth taking. It strains credulity to suggest that Ranger put up a $100,000 bond to secure a no-contact provision and did so without assurances, thereby assuming an enormous financial risk. Presumably, Ranger and/or Lucky 7 made the business judgment that it was a reasonable risk to take. Surely the risk was addressed in some fashion by Ranger, whether through premiums, collateral, indemnity agreements, past or future business, or a combination of those and other unknown factors. That risk falls squarely on Ranger and Lucky 7. Ranger is not an eleemosynary institution. When it issued the bond, it did so to make a profit.

The supervision of the defendant also weighs heavily in our consideration. The trial court found that Lucky 7 and Ranger made no effort to supervise defendant to ensure that he would comply with the no-contact provision. The State claims that respondents were allowed to post a bond, collect the premium and "forget the whole thing." We agree. The surety " 'seems to have been content to post the bonds and then forget the whole thing. It was only when called upon to make good the bonds that they awakened to what had occurred.' " *State v. Causey,* 190 *N.J.Su-*

*per.* 257, 267, 463 *A.*2d 352 (App.Div.1983) (quoting *Allegheny Mut. Cas. Co. v. State,* 35 *Md.App.* 55, 368 *A.*2d 1032, 1034 (1977)).

The burden was on respondents to demonstrate that forfeiture was inequitable. During at least three days of hearings respondents had the opportunity and the obligation to demonstrate any efforts at compliance. They did not, leaving the record silent regarding any efforts they may have made. We infer from that failure, as did the trial court, that no such efforts were made. That further justifies forfeiture.

Respondents argue that they cannot oversee the conduct of a defendant at all times. It is one thing, the argument goes, for a bail company to assure that a defendant appears on a return date. It is something else to require that the bailor oversee all of defendant's conduct because the surety cannot be with a defendant at all times. As noted above, however, the respondents are in the business of risk for profit and they assumed the risk. In any event, the success of private entrepreneurs in their oversight of a client is not dispositive. Effort remains relevant, and they apparently made no effort here.

Deterrence is also a factor to be considered. *See, e.g., United States v. Gambino, supra,* 17 *F.*3d at 575. *See also Jeffers v. United States,* 588 *F.*2d 425, 427 (4th Cir.1978) ("[I]f a violation of a condition of release is more than technical, the court may require a substantial forfeiture to deter not only the defendant but others from future violations."); *State v. Hedrick,* 204 *W.Va.* 547, 514 *S.E.*2d 397, 407 (1999) (same). Korecky blatantly violated the no-contact condition when he threatened Feinstein with physical harm if he cooperated with the State. That was not a technical violation; it was willful. It could have mortally wounded the State's case. It undercut what trial courts seek to prevent here and in future cases—obstruction of justice.

■ Perhaps the most critical fact in this appeal is Pinto's express consent to the no-contact condition and to forfeiture in the event of Korecky's violation of that provision. Pinto signed the

condition attached to the bond, which provided, "In the event of any such contact, this bail will be revoked and forfeited." Once that commitment was made, the surety properly was held to its obligation. Respondents do not point to any compelling reason to suggest that they should not be held to the agreement reached with the court. Whether viewed as one ingredient in the totality of the circumstances, or as an independent reason that alone justifies forfeiture, respondents are bound by their bargain.

## III

■ Ranger urges that the power of attorney relieves Ranger of liability. That power of attorney purports to limit Lucky 7's authority to bind Ranger as surety only to bonds involving appearance conditions and no other. However, the power of attorney was not attached to the bond when it was submitted to the court for review, but was attached later. The trial court had no reason to suspect that Lucky 7's authority was limited. Without any such reason, Pinto had apparent authority, as Ranger's agent, to agree to the condition. *United States v. Vaccaro,* 719 *F.Supp.* 1510, 1518 (D.Nev.1989), *appeal dismissed,* 931 *F.*2d 605 (9th Cir.1991), *dismissed in part and aff'd. in part,* 51 *F.*3d 189 (9th Cir.1995) (holding surety liable for breach of "violate no laws" condition, despite that power of attorney limited agent to authority to enter into "appearance" conditions); *United States v. Ferguson,* 409 *F.Supp.* 393, 397 (S.D.Ga.1975), *aff'd without opinion,* 529 *F.*2d 999 (5th Cir.1976) (stating that power of attorney "[i]n no way . . . affect[s] the substantive obligation or condition of the bond itself"); *People v. Rincon,* 43 *Colo.App.* 155, 603 *P.*2d 953, 955 (1979) ("The condition was imposed prior to the posting of the bond by [the agent of the surety], and the surety's failure to inform himself of the existing bond conditions does not relieve him from the responsibility under the bond obligation."); *State v. Boatwright,* 310 *S.C.* 281, 423 *S.E.*2d 139, 141 (1992) (stating that a bail bond professional "is certainly aware that an appearance bond carries conditions beyond the defendant's presence in court"); *State v. Parada,* 75

*Wash.App.* 224, 877 *P.*2d 231, 235–36 (1994) (addressing bail forfeiture, and stating that "[u]nder agency law, notice given to and knowledge acquired by an agent are imputed to its principal as a matter of law"); *cf. State v. Causey, supra,* 190 *N.J.Super.* at 265, 463 *A.*2d 352 ("[S]tate has no duty to notify a surety of the principal's appearance dates.").

Lucky 7 had the apparent authority to bind Ranger. Lucky 7 was Ranger's agent. Ranger supplied Lucky 7 with power of attorney forms for the purpose of entering into recognizance of bail contracts. Ranger, by giving Lucky 7 its power of attorney forms, represented that Lucky 7 had the authority to enter into and thus bind Ranger to recognizance of bail contracts. Moreover, in addition to the apparent authority of Lucky 7 to bind Ranger, Ranger failed to insure that Lucky 7 acted within the scope of its authority. See *State v. Sellers,* 258 *N.W.*2d 292, 297–98 (Iowa 1977) (holding surety liable in bail forfeiture case based in part on surety's lack of instruction to agent as to manner in which powers of attorney could be employed and lack of supervision of the agent).

Even if the trial court was correct when it noted that the representative from Lucky 7 may have "pulled a fast one" on the court and others by attaching the power of attorney to the recognizance after the court's review and approval, that does not relieve Ranger from responsibility. In *Sellers, supra,* 258 *N.W.*2d at 298, the court stated:

> A fraud committed by an agent on the state as a third party does not relieve the defendant of liability for acts committed within the agent's apparent authority as in this case. A fraud committed on the principal does not relieve it for acts done under the agent's apparent authority, especially when the commission of the fraud was the result of defendant's negligence in supervising its agents.
>
> [*Ibid.* (citations omitted).]

*See also United States v. Sanchez,* 521 *F.*2d 244, 246 (5th Cir.) (affirming forfeiture of surety's bond in case involving fraudulent acts of its agent who altered individual powers of attorney), *cert. denied,* 429 *U.S.* 817, 97 *S.Ct.* 59, 50 *L.Ed.*2d 77 (1976); *C & F Bonding Co. v. State,* 224 *Ga.App.* 188, 480 *S.E.*2d 240, 241 (1997)

(affirming bail forfeiture when bonding company's agent absconded with fee, because "such matter is between [surety] and its agent").

Finally, Ranger ratified the conduct of Lucky 7. The recognizance of bail was executed and filed with the bail office on the same day Korecky was released from the Ocean County Jail. Ranger had thirty days to terminate the recognizance of bail contract by surrendering Korecky. There is no evidence that Ranger contacted its own agent or the bail office to ascertain the facts surrounding the matter. Instead, Ranger chose to remain silent and retain the premium money it presumably received. In *State v. Gonzalez*, 69 *N.J.Super.* 283, 288–89, 174 *A.*2d 209 (App. Div.1961), the court stated that

> even if the surety might have been exonerated by a technical deficiency in the bail—and we hold it was not—the acceptance and retention of custody of the principal by the surety in accordance with the recognizance, precluded the surety from attacking the instrument after breach.
>
>     . . . .
>
> [The surety] was free to surrender [the defendant] at the time of the arraignment when he was remanded to jail, or during his detention, or at any time after his release therefrom. It did not do so, but instead chose to retain the premium it had charged in exchange for its guarantee to produce the principal at the trial, and thereafter, if need be. It made no effort to terminate its obligation by surrendering [the defendant] until it was prevented from doing so by his flight. This was too late.

*See also United States v. Ferguson, supra,* 409 *F.Supp.* at 396 ("By retaining money paid after knowledge that its source was the principal's credit, through an unauthorized assumption of authority by an agent, the principal ratifies the act irrespective of any intent to do so."); *People v. Ranger Ins. Co.,* 31 *Cal.App.*4th 13, 36 *Cal.Rptr.*2d 807, 813 (1994) (holding that when bail agent exceeded power of attorney and premium money was kept by surety who did not take action, surety may be estopped to disavow that action); *Johnson v. Hosp. Serv. Plan of N.J.,* 25 *N.J.* 134, 140–42, 135 *A.*2d 483 (1957) (concluding that intent to ratify unauthorized transaction can be inferred from failure to repudiate transaction); *Weddel v. State,* 756 *S.W.*2d 76, 79 (Tex.Ct.App.1988) (noting that because surety "took no step to immediately clarify the situation

and take corrective action[,] ... [r]atification by inaction is an appropriate characterization").

The trial court set forth Ranger's responsibility and Ranger's remedy:

> It is suggested that the agent has exceeded his authority in agreeing to the obligation. I would suggest that it's—if that is so, it's a matter between the surety and its agent. And if, indeed, he did, the agent might conceivably be liable over to the surety. However, it was the surety who gave the agent its recognizance bonds and authorized him to obtain defendant's release in exchange for a premium. And the surety is responsible for its agent's agreement to the conditions imposed by the Court.

## IV

Although the Appellate Division acknowledged that the public interest was offended by defendant's breach of the no-contact provision, it concluded that "neither the State nor the public suffered any meaningful prejudice by defendant's failure to honor the ... provision." *Korecky, supra,* 333 *N.J.Super.* at 84, 754 A.2d 601. It noted that there was no finding of costs incurred by the State and that Korecky's plea and plea bargain "substantially assuaged" the public interest. *Ibid.*

The notion that the State must prove expenses and prejudice in order to justify a bail forfeiture was properly rejected in *State v. Mercado, supra,* 329 *N.J.Super.* at 270–71, 747 A.2d 785. In *Mercado,* a bail remission case involving three matters, the surety argued that "it is incumbent upon the county to present evidence of these factors [expense and prejudice to the State] to justify a forfeiture." *Id.* at 270, 747 A.2d 785. The court

> conclude[d] that the county does not have the burden to present such evidence, at least in a case where the surety fails to demonstrate that it made reasonable efforts to secure the defendant's return to custody and the defendant remains a fugitive for a substantial period of time.
>
> [*Id.* at 270–71, 747 A.2d 785.]

Although *Mercado* involves the "traditional" breach of failure to appear, its holding is applicable here. The focus of a court reviewing a forfeiture application should be on the surety's efforts, "rather than upon the expenses incurred by the State as a result

of the defendant's failure to appear or the prejudice to the State's case caused by the defendant's absence." *Mercado, supra,* 329 *N.J.Super.* at 271, 747 *A.*2d 785.

*Mercado* is consistent with cases in other jurisdictions. In *State v. Werner,* 667 *A.*2d 770, 775 (R.I.1995), the Rhode Island Supreme Court held that the motion court did not abuse its discretion in ordering full forfeiture in the amount of $250,000 even though the State only expended $200 to secure custody of defendant. The *Werner* court explained that "although it is true that the State was put to minimal expense, $200, to secure custody of Werner, cost to the state is only one of *several* factors in the set-aside bail-forfeiture analysis." *Ibid. See also United States v. Amwest Sur. Ins. Co., supra,* 54 *F.*3d at 603 (noting that government's failure to demonstrate prejudice or costs does not compel remission); *United States v. Abernathy,* 757 *F.*2d 1012, 1015–16 (9th Cir.) (refusing remission even when government fails to specify value of expenses incurred as a result of bailee's breach), *cert. denied,* 474 *U.S.* 854, 106 *S.Ct.* 156, 88 *L.Ed.*2d 129 (1985); *United States v. Stanley,* 601 *F.*2d 380, 382 (9th Cir.1979) (holding bond forfeiture proper even when government fails to show expenses incurred); *State v. Hedrick, supra,* 514 *S.E.*2d at 407 ("[T]he State's expenses are only one of many factors to be considered.").

This matter implicates important public interests that offset the alleged lack of prejudice and lack of costs. At stake here, at least in part, is the ability of the State to control to a limited degree the activities of defendants when out on bail. This defendant had threatened a co-defendant. After the bond was increased a second time, he threatened another co-defendant. The State must make reasonably certain that those who allegedly have violated the law, and who are allowed to remain free in society pending resolution of those violations, comply with certain basic rules. They cannot compound their felony, in both a literal and figurative sense, by threatening others. Conduct that is contemptuous of a court order may place members of the public who agree to testify

for the State in harm's way. The imposition of strict bail requirements, with consequences for non-compliance for both the surety and the defendant, serves well the common weal.

V

We have one final concern. The wholesale imposition of conditions regulating defendants' behavior could result in a dramatic increase in the cost of surety bonds. That in turn may impair the ability of defendants, particularly defendants without significant financial resources, to obtain bonds. Such a result would not only defeat the purpose of the bail bond, but would result in gross unfairness. *See generally Report of the Supreme Court Committee on Criminal Practice, Subcommittee on Bail,* 125 *N.J.L.J.* 109, 112–14 (Jan. 11, 1990) (discussing importance of manner in which bail system treats defendants without significant financial resources). With that concern in mind, we caution trial courts to weigh carefully the totality of the circumstances present when determining whether to impose a bond condition other than appearance, and to exercise the authority to forfeit a bond for a breach of such a condition sparingly. Our bail system should not seek to guarantee the behavior of a defendant while he or she is out on bail.

Used with caution, however, conduct-related conditions may be appropriate. Thus,

[t]he one form of preventative detention which is most likely to pass muster under the federal constitution is that allowing revocation of pretrial release and detention until trial upon a showing that the defendant engaged in misconduct during that release. This is most obviously the case where the defendant has unlawfully tried to thwart his prosecution or conviction, that is, where he, "for the purpose of interfering with or obstructing or attempting to interfere with or obstruct justice, has threatened, injured, or intimidated or attempted to threaten, injure, or intimidate any prospective witness, juror, prosecutor, or court officer." Notwithstanding any constitutional or statutory right to bail, a court has "the inherent power to *confine* the defendant" in such circumstances in the interest of "safeguarding the integrity of its own process."

[3  Wayne R. LaFave et al., *Criminal Procedure,* § 12.3(g) at 790 (2d ed.1999) (footnotes omitted).]

In those circumstances, also, forfeiture of bail could be used as an additional tool to ensure compliance. Such a remedy should be used sparingly for violations of conditions other than those regulating appearance. That said, we are confident that we will continue to have a bail system that centers on its historical goal, the assurance of the presence of a defendant in court. Forfeiture of the bond is appropriate in this case, however, because defendant subverted the public interest by twice threatening witnesses against him.

In summary, based on this record, and in view of the surety's apparent consent to imposition of the no-contact condition and to the forfeiture of the bond if the condition was violated, the forfeiture was valid. Because forfeiture for violation of that condition appears to be unprecedented in our State, and because the State acknowledged that flexibility in fixing the amount of the forfeiture is appropriate, we direct that the amount of forfeiture be remitted to $25,000 rather than the $50,000 ordered by the trial court. Accordingly, the judgment of the Appellate Division is reversed and the matter is remanded to the Law Division for proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA and ZAZZALI—7.

*Opposed*—None.